**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JOHN MICHAEL JONES,             :       CIVIL ACTION
             Plaintiff,         :
                               :
   v.                       :
                               :    NO. 20-318
ANDREW SAUL,                :
            Defendant.     :

**<u>MEMORANDUM OPINION</u>**

**Timothy R. Rice**                                           **August 20, 2020**
**U.S. Magistrate Judge**

      Plaintiff John Jones alleges the Administrative Law Judge ("ALJ") erred by discounting

the opinions of his treating providers without substantial supporting evidence. Pl. Br. (doc. 15)

at 1. For the reasons explained below, I deny Jones's claims.

      Jones first applied for Disability Insurance Benefits (DIB) in April 2017, following a

series of short-term disability leaves. R. at 157, 683, 731, 746, 754. Jones had first left work in

early 2014, when he was hospitalized with a C. diff. infection.[1] <u>Id.</u> at 712. He then suffered

from recurrent ankle pain, <u>id.</u> at 706, which ultimately led to a diagnosis of complex regional

pain syndrome (CRPS),[2] <u>id.</u> at 552, 1085. During this time period, Jones also began treatment

for migraines and had his gallbladder removed. <u>Id.</u> at 552, 1070-90. After returning to work for

less than a year, the pain in his legs and back worsened and he had a spinal stimulator implanted

---

[1]      C. Diff, or Clostridium Difficile, is a bacteria that can cause acute, serious
gastrointestinal symptoms. <u>Dorland's Illustrated Medical Dictionary</u> (32nd ed. 2012)
("Dorland's") at 374, 625.

[2]      CRPS is a pain disorder triggered by a neurological injury. R. at 70; <u>see also</u>
<u>https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Complex-</u>
<u>Regional-Pain-Syndrome-Fact-Sheet</u> (last visited August 20, 2020).

in the summer of 2015.  Id. at 687-89.  In January 2016, he was hospitalized when a long-term allergy to onions resulted in anaphylaxis for the first time.  Id. at 467-68.  Following this hospitalization, pre-existing insomnia and anxiety increased.  Id. at 665-66.  He returned to work again in early 2016, id. at 661-62, but suffered an additional episode of allergic anaphylaxis in April of that year, id. at 462, 498, 552, 649.  In May 2016, his left shoulder was injured, id. at 556, and in June 2016, his left leg became painful again, despite the internal stimulator, id. at 632.  In the fall of 2016, he stopped working again for left shoulder surgery.  Id. at 557, 617.  He listed this time as the alleged onset of full disability in his DIB application.  Id. at 157.

In November 2016, another episode of allergic anaphylaxis led to a prolonged period of pulmonary symptoms and chest pain that were ultimately diagnosed as hyperventilation syndrome, a psychological condition.  Id. at 444, 446, 481, 484, 488, 764, 744, 738.  Jones's other pulmonary symptoms were attributed to severe sleep apnea, which he repeatedly declined to treat with a CPAP machine.[3]  Id. at 751, 754, 434, 750, 430-31, 477.  Jones was ultimately issued a CPAP machine, but never used it as directed.  Id. at 881, 993.

In March 2017, one of Jones's treating physicians cleared him to return to work as long as his hyperventilation syndrome could be accommodated with unscheduled breaks, but he disagreed with the recommendation and did not return.  Id. at 422-23, 737, 603.  That same month, Jones began outpatient psychiatric treatment, after his primary care physician's recommendation of involuntary psychiatric hospitalization was overruled at the emergency room.  Id. at 772.

---

[3]     A CPAP machine provides "continuous positive airway pressure," to alleviate the periodic cessation of breathing that characterizes sleep apnea.  Dorland's, at 116-17, 427.

In an April 2017 functional evaluation ordered by a treating provider, Jones was found unable to return to his previous job but capable of "light workload capacity." Id. at 591. He was referred to physical therapy, filed for DIB, and declined the voluntary psychiatric hospitalization recommended by his primary care provider. Id. at 157, 590, 964. In June 2017, Jones's physical therapy was canceled for failure to participate. Id. at 953. Over the fall of 2017, Jones continued to complain of intense pain and his medications were adjusted, although he was unable to obtain pain injections due to his hyperventilation syndrome and continued to be noncompliant with his CPAP regimen. Id. at 912-13, 918, 934, 1018. By late 2017, Jones's pain management doctor planned to perform pain injections under full anesthesia, but Jones was still noncompliant with his CPAP regimen and refused to attend the more intensive outpatient mental health program recommended by his psychiatrist. Id. at 880, 886, 896, 1009.

On December 28, 2017, Jones was sent to the emergency room after telling his therapist he had taken extra medication. Id. at 871. He explained to hospital providers that he had merely been trying to adjust his dosages, and was discharged. Id. at 875. A month later, he admitted to his psychiatrist that he had tried to overdose, but still refused to participate in the day program his psychiatrist recommended. Id. at 1004, 1006. After repeatedly exhibiting disruptive behavior at his long-time primary care provider's office, id. at 866, Jones started with a new primary care practice in March 2018. Id. at 1048. He continued to see his psychiatrist through the spring of 2018, and his medications were regularly adjusted. Id. at 1148-1199.

In May 2018, Jones sprained his ankle on his neighbor's lawn; one medical record says that he was walking on the lawn and fell in a hole, another states he was mowing the lawn. Id. at 1119, 1126. At his August 2018 hearing, Jones testified he had been visiting his neighbor, not mowing the lawn. Id. at 39. In late May 2018, Jones's new primary care provider filled out

FMLA forms, stating Jones should not work due to his severe psychiatric issues and ongoing muscle weakness.  Id. at 1139.  By July 2018, his psychiatrist had extended the schedule of his medication management visits to every six to eight weeks instead of every month.  Id. at 1163.

At his August 2018 hearing, Jones testified he was unable to work because his CRPS limited his ability to sit, stand, or walk for a prolonged period of time, and his depression and anxiety had affected his memory, focus, and concentration.  Id. at 42-43.  He testified he could dress himself but not always shower without help, that he "seldom" cooked, almost never shopped, washed dishes and did laundry only if others carried it, id. at 38, vacuumed or swept "once in a while," never took out the trash or tended to the yard, but was able to drive himself to doctor appointments, id. at 39.  He testified that he did not engage in social activities and his wife brought their children to most sporting events.  Id. at 41-42.  He testified that he napped during the day and took his medications as prescribed.  Id. at 43.  A consulting physician reviewed Jones's medical records on the stand and opined that Jones could perform a limited range of medium work.  Id. at 63.  A vocational expert (VE) testified that such work was available in the national economy.  Id. at 74.

The ALJ adopted physical functional limitations for Jones that were beyond those recommended by the consulting physician, id. at 21, 63, and mental functional limitations consistent with those recommended by the reviewing psychologist, id. at 22, 88.  He opined Jones did not qualify for benefits because his residual functional capacity (RFC), i.e., "the most [he] can still do [in a work setting] despite [his] limitations,"  20 C.F.R. § 404.1545(a),  allowed

for a limited scope of medium work.[4]  He relied on the VE testimony to find that Jones could perform work as a laundry worker, potato chip sorter, or bakery conveyer worker.  R. at 27.

Jones argues the ALJ improperly discounted the opinions of his treating physician and psychologist.  Pl. Br. at 1.  I disagree.

Dr. Scott

In June 2017, Jones's primary care physician, Dr. Scott, opined that Jones could not sit or concentrate for extended periods of time in a written note excusing him from jury duty.  R. at 25 (citing id. at 954).  The next month, she opined Jones was limited to lifting 10 pounds occasionally, that he had limitations on his reaching, handling, and fingering, that he could sit for five to six hours in an eight-hour workday and stand for two to three hours, although he would need to lie down and take unscheduled breaks and would be absent more than four times per month.  Id. at 25 (citing id. at 931-32).  Finally, in December 2017, Dr. Scott offered an opinion consistent with her July 2017 opinion, specifying that Jones could drive as long as he was not experiencing exacerbated symptoms, but could not operate hazardous machinery.  Id. at 25 (citing id. at 876-77).

The ALJ discounted Dr. Scott's opinion based on: (1) its inconsistency with treatment records, "which generally show[ed] the claimant was in no acute distress with normal mood and affect"; (2) the lack of explanation within the opinion itself; and (3) Jones's "treatment history," which shows he "prepare[d] simple meals, vacuum[ed], t[ook] out the trash, dr[ove], and shop[ped] in stores."  Id. at 25.

---

[4]     The ALJ specifically found Jones could perform medium work comprised of simple, routine, repetitive tasks that require only occasional interaction with supervisors or co-workers, no interaction with the public, no climbing of ladders, scaffolds, or rope, and no exposure to excessive noise, bright lights, fumes, odors, dusts, gases, poor ventilation, hazards, or machinery with moving parts.  R. at 21-22.

Jones argues the ALJ's decision does not provide substantial evidence to discount Dr. Scott's opinion because observations regarding his mood and affect cannot contradict the opinion regarding his ability to walk, stand, lift, and/or carry.  Pl. Br. at 6.  The connection between Jones's mood/affect and physical ability lies in the testimony of the consulting physician, Dr. Sklaroff.  Dr. Sklaroff testified that Jones could stand, sit, or walk up to six hours in an eight-hour day because there was "no problem with the nerves, the muscles, the joints, or the bones, that would preclude that."  R. at 63.  On cross-examination, he opined that the exacerbation of Jones's headaches and other complaints of pain were caused by psychological conditions, but that Jones's psychological impairments would not preclude gainful employment.  Id. at 68.  In contrast, Dr. Scott had not attributed Jones's migraine and other pain complaints to his mental impairment, but instead opined that they were caused by his CRPS.  Id. at 954.

The ALJ was entitled to adopt Dr. Sklaroff's view, as long as he met the regulatory standard for explaining his decision. 20 C.F.R. § 404.1520c; Hopkins v. Comm'r Soc. Sec., No. 19-2437, 2020 WL 2730791, at *3 (3d Cir. May 26, 2020) (affirming ALJ opinion that discounted statement of treating pulmonologist on the basis of its inconsistency with the overall treatment record and the opinions of the consulting and reviewing physicians).

Dr. Sklaroff described Dr. Scott's opinion as "a physical assessment from the complex regional pain perspective."  R. at 69.  He testified that he saw no basis for Dr. Scott's conclusion that CRPS affected Jones's lifting, need for breaks, or absenteeism.  Id.  He explained that, although CRPS could cause debilitating pain, the credibility of pain complaints could be evaluated based on objective data.  Id. at 70.

In accordance with Dr. Sklaroff's opinion, the ALJ evaluated the consistency of the reported severity of Jones's symptoms for each condition.  Id. at 23-24.  He found them all

inconsistent with the treatment record.  Id.  With respect to the CRPS, the ALJ explained that

treatment records generally showed: (1) normal gait; (2) normal station; (3) good strength; (4)

normal range of motion; (5) normal sensation; (6) normal coordination; (7) normal deep tendon

reflexes; (8) no deformity; (9) no tenderness; and (10) no edema.  Id. at 23.  The ALJ also noted

Jones's activities included living with his family, preparing simple meals, vacuuming, taking out

the trash, and shopping in stores.  Id.  Finally, he noted the reported severity of Jones's CRPS

was inconsistent with the February 2017 thoracic x-ray showing only mild degenerative changes,

the March 2017 electrodiagnostic testing showing only one-sided carpal tunnel syndrome, and

the fact that his physical therapy was discontinued in June 2017 for failure to attend.  Id.

      The ALJ went on to list the inconsistencies in the reported severity of Jones's migraines,

which included: (1) normal exams; (2) an August 2017 note by the treating neurologist that Jones

was "doing well"; and (3) his activities of daily living.  Id. at 23.  He also noted Jones's

complaints regarding his sleeping/breathing were inconsistent with his: (1) normal exams; (2)

CPAP noncompliance; and (3) activities of daily living.  Id.  Finally, the ALJ found Jones's

allegations of disabling mental functional limitations inconsistent with the record because of his

"generally" normal psychiatric exams and activities of daily living.  Id. at 24.

      Jones claims the ALJ "cherry-picked" from the medical records, ignoring significant

findings that supported his claim.  Pl. Br. at 7.  The ALJ, however, need not reference every

medical record to support his conclusion with substantial evidence.  Hur v. Barnhart, 94 F.

App'x 130, 133 (3d Cir. 2004) ("There is no requirement that the ALJ discuss in its opinion

every tidbit of evidence included in the record.").

      The ALJ implicitly acknowledged that he had not referenced every medical record by

characterizing the "longitudinal record" and the findings "generally" made.  R. at 24-26.  This

characterization was accurate, and the abnormal findings noted in Jones's brief are actually the outliers of the medical record as a whole.  For instance, Jones accurately points out the abnormal pinprick testing results from March 2017.  Pl. Br. at 7 (citing R. at 411).  However, this appears to be the only instance of abnormal pinprick testing documented in the record.  Moreover, electrodiagnostic testing performed that same day was normal.  Id. at 724.  Similarly, Jones cites a single finding of muscle weakness, an August 2017 rating of 4+ out of 5 strength in his left arm.  Id. at 1106.  But this finding is inconsistent with subsequent normal physical exams in September, id. at 914-15, October, id. at 904, November, id. at 898, and December of 2017, id. at 887, as well as the normal gait, muscle tone, and strength findings included in each of Jones's psychiatric appointment records throughout 2017 and 2018, id. at 1148-99.

Jones also argues his activities of daily living are not inconsistent with Dr. Scott's opinion or his allegations.  Pl. Br. at 9.  Jones ignores, however, his testimony that he could not take out the trash because of the required lifting, which was inconsistent with his own function report.  Compare R. at 39, with id. at 198.  Although the ALJ's RFC analysis confirms that Jones's impairments preclude returning to his former position, id. at 26-27, the ALJ was entitled to conclude that his ongoing activities of daily living were inconsistent with Dr. Scott's opinion that he was unable to perform any job due to his impairments.  See, e.g., Hoyman v. Colvin, 606 F. App'x 678, 680 (3d Cir. 2015) (affirming ALJ opinion that discounted reported limitations based in part on inconsistency with daily activities); Holiday v. Barnhart, 76 F. App'x 479, 482 (3d Cir. 2003) (same).

Finally, the ALJ explained that he discounted Dr. Scott's opinion because it was in check-off form.  R. at 25.  Although Jones argues the opinion should not be classified as such because it was submitted with supporting medical records, Pl. Br. at 8, the opinion itself was in

check-off form, as opposed to a form measuring range of motion or strength, or a letter

describing the details of a medical condition and its subsequent limitations, R. at 876-77.  The

ALJ was entitled to weigh the opinion's check-off format against it.  Smith v. Astrue, 359 F.

App'x 313, 316 (3d Cir. 2009) ("checklist forms . . .  are considered weak evidence at best in the

context of a disability analysis").

As a whole, the ALJ adequately discussed the medical record and provided substantial

evidence to support discounting Dr. Scott's opinion.  See Mickie v. Comm'r of Soc. Sec., 785 F.

App'x 51, 53 (3d Cir. 2019) (affirming ALJ decision to deny benefits even though ALJ did not

specifically address CT scan with adverse findings when ALJ discussed longitudinal medical

record thoroughly and referenced the exhibit containing the scan).

Dr. Coleman

Jones also argues the ALJ improperly discounted the opinion of his treating therapist, Dr.

Coleman.  Dr. Coleman opined Jones suffered from marked limitations in his ability to interact

with others and manage himself in a work situation and an extreme limitation in his ability to

manage conflict with others.  R. at 781-83.  The ALJ explained he discounted this opinion

because: (1) it was not supported by the treatment notes;[5] (2) it was a mere check-off opinion

that did not provide a detailed explanation; and (3) it was inconsistent with a lack of inpatient

---

[5]     Jones also suggests the ALJ improperly held the lack of further medical records against
him, arguing that Coleman's opinion is consistent with the sole record he produced of her
treatment.  Pl. Br. at 13.  The progress notes the ALJ found inconsistent with Coleman's opinion,
however, were from other treating providers, including Jones's primary care practice, pain
management specialist, and psychiatrist.  R. at 26.  The ALJ did not hold the absence of Jones's
therapy records against him, and was not required to seek those records when psychiatric and
other medical records provided substantial evidence on which to make a determination.  Smith v.
Comm'r of Soc. Sec., 80 F. App'x 268, 270 (3d Cir. 2003); see also Myers v. Berryhill, 373 F.
Supp. 3d 528, 539 (M.D. Pa. 2019) (noting the ALJ "is not required to search out relevant
evidence which might be available, since that would in effect shift the burden of proof to the
government").

hospitalization.  R. at 26.  Specifically, the ALJ noted that, although Jones's psychologist opined he suffered from marked and extreme limitations, his treatment notes generally showed he was "fully oriented and cooperative with appropriate affect, normal mood, normal grooming and hygiene, normal speech, goal directed and logical thought processes, normal associations, normal memory, normal behavior, normal thought content, intact attention, appropriate fund of knowledge, intact insight, and fair judgment."  Id.

Most of the ALJ's description is accurate.  Other than a period of crisis at the end of 2017 and very beginning of 2018, id. at 871 (telling emergency room staff he had been adjusting his medication dosages), 1004 (admitting to intentionally overdosing and drinking three drinks per day), Jones's mental status examinations generally showed normal appearance, speech, and thought processes, id. at 1148-99.

Jones's affect and mood, particularly as assessed by his psychiatrist throughout 2017 and 2018, was not generally normal.  Id.  This limited inaccuracy by the ALJ, however, does not render the ALJ's supporting evidence insubstantial.  See Orriols v. Comm'r of Soc. Sec., 228 F. App'x 219, 222 (3d Cir. 2007) (affirming ALJ denial of benefits when claimant was capable of a limited RFC despite consistent findings of abnormal mood and affect).  The ALJ's findings of generally appropriate orientation, grooming, speech, thought processes, memory, attention, and concentration are accurate.  Id.  Further, the ALJ reasonably concluded Jones's allegations of compromised concentration, focus, memory, and social skills were inconsistent with the medical record and his daily activities.  Id. at 24.

The ALJ also was entitled to conclude that "extreme" limitations would have likely required Jones to have inpatient hospitalization.  Foor v. Berryhill, No. 18-64, 2019 WL 1296882, at *4 (W.D. Pa. Mar. 21, 2019) (noting lack of inpatient psychiatric hospitalization is

an "appropriate bas[i]s" for discounting a treating provider's opinion that a claimant is subject to extreme limitations); see also Minch v. Comm'r of Soc. Sec., 715 F. App'x 153, 157 (3d Cir. 2017) (upholding ALJ determination that claimant's mental impairment was not severe when, after 10 days of inpatient care precipitated by losing custody of his daughter, he was stable with psychiatric treatment). Although Jones's primary care providers recommended inpatient treatment, the emergency room physicians disagreed that it was necessary, id. at 772, and Jones repeatedly rejected recommendations for voluntary inpatient or even more intensive outpatient treatment. Id. at 1004, 1006, 1009.

Jones was consistently noncompliant with his CPAP treatment, which the medical expert testified could have contributed to his headaches, id. at 55, 881, 913 (showing Jones used his CPAP for at least four hours per night 7% of the time), id. at 1003, 1168, 1171, and which the medical record shows could have even been responsible for his most serious psychiatric symptoms, id. at 722 ("hypnagogic hallucinations and somniloquy can be due to chronic sleep deprivation from sleep apnea"). The ALJ was entitled to find his noncompliance inconsistent with conditions so severe as to compromise his functionality to the extent Jones testified. SSR 16-3P, 2017 WL 5180304, at *10-11 (S.S.A. Oct. 25, 2017).

The ALJ was required to set forth only substantial evidence to support his opinion and I may not re-weigh the evidence to reach a different result. Donatelli v. Barnhart, 127 F. App'x 626, 630 (3d Cir. 2005) ("under the substantial evidence standard, the question is not whether we would have arrived at the same decision; it is whether there is substantial evidence supporting the Commissioner's decision"); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) ("whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high").

An appropriate Order accompanies this Opinion.